**UNIVERSITY OF ALASKA, Appellant,**

v.

**David L. CHAUVIN, Appellee.**

**No. 1991.**

Supreme Court of Alaska.

May 1, 1974.

John W. Pletcher, III of Merdes, Schaible, Staley & DeLisio, Anchorage, for appellant.

William V. Boggess, Fairbanks, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

## OPINION

FITZGERALD, Justice.

David Chauvin brought an action against the University of Alaska [1] for breach his contract of employment. After trial, he obtained a judgment of $49,086.08 for damages, prejudgment interest, costs and attorneys' fees. The University has appealed.

Chauvin was first employed by the University in 1961. He has since held several positions, all of them involving technical engineering skills.

In 1967 Chauvin was given tenure as an "Associate Electrical Engineer." [2] Later he became "University Engineer for Planning and Construction," and then finally "Systems Engineer." The last two positions involved administrative as well as technical duties.

In February of 1971, Chauvin was notified by the University administration that his position ("Systems Engineer") was being terminated, and he was advised to seek another niche in the University.

University President William Wood, on May 26, 1971, notified Chauvin that a financial exigency existed which prevented the University from offering him a position for the year following June 30, 1971, when Chauvin's existing contract expired.

Chauvin wrote to the University Tenure Committee to request its aid in securing continued employment. [3] The Tenure Committee met and decided that Chauvin did have tenure as an "Associate Electrical Engineer"; however, his present position ("Systems Analyst") was not eligible for tenure since it was an administrative rather than faculty position. The Tenure Committee decided also that it had no "jurisdiction" over the dispute because the proposed termination was not for cause, but because of financial exigency. The Tenure Committee advised Chauvin to seek review by a joint committee of faculty and administrators. [4]

A joint committee was appointed and it selected Professor John Distad as chairman. Professor Distad sought the advice of the University administration for guidance in the matter of establishing a hearing procedure. [5] The University's execu-

1. The University became a state university by virtue of Art. VII, Section 2 of the Alaska constitution:
   "The University of Alaska is hereby established as the state university . . . ."

2. The tenure system was adopted by the Board of Regents in 1965. The Board is the governing body of the University, pursuant to Art. VII, Sec. 3 of the Alaska constitution:
   "The University of Alaska shall be governed by a board of regents. . . . The board shall, in accordance with law, formulate policy . . . ."

3. The Tenure Committee was established by President Wood in order to effectuate the Regents' Tenure Policy. The committee makes recommendations to the president as to whom should be offered tenure. When the administration wishes to terminate a tenured faculty member for cause, the committee is empowered to hold hearings and recommend actions to the president.

4. The Tenure Committee concluded that it lacked "jurisdiction" because President Wood's administrative order provided regulations to guide the Tenure Committee only in proceedings to terminate for cause. The Regents' Tenure Policy provided for review not only in cases of termination for cause but for financial exigency and medical disability. The Tenure Committee determined therefore that the administration should appoint another committee to review Chauvin's termination.

5. Because President Wood's faculty bulletin provided a hearing procedure only for termination for cause, there was a requirement for a hearing (mandated by the Regents' Tenure Policy) but no guidelines for proceeding in cases of termination for financial exigency.

tive director of budget development and legal affairs, Dr. Harold Byrd, after consulting the University's attorneys, advised Professor Distad to err "on the side of greater measure of formalities or due process." Dr. Byrd therefore advised the committee to utilize the procedures established by President Wood for termination for cause. This procedure involved a preliminary stage of informal inquiry to assist the administration and faculty member "in arriving at an agreement if possible." If settlement fails, then the administration is permitted to pursue the matter at a formal hearing. Dr. Wood's regulation provided that a faculty member must be given fifteen days' notice of the formal hearing, together with a statement of the reason for the proposed termination. The committee is further charged with informing the faculty member of all rights afforded him by the regulations, including the right to counsel, the right to be informed of the evidence on which charges are based, the right to obtain the presence of witnesses and to question witnesses within reasonable limits, the right to confront all adverse witnesses, and the right to receive a record of the hearing. Chauvin was notified that the committee would follow this two-step procedure.[6]

Since Chauvin's existing contract was to expire shortly, Professor Distad promptly called a committee meeting, giving Chauvin at most two or three days' notice. The first meeting commenced on June 29, 1971. At this meeting the committee agreed once more to follow the guidelines set forth in the regulations.

When the committee convened Chauvin made a brief statement, answered a few questions, then was ushered out of the meeting by Professor Distad. The com-

mittee proceeded to hear other witnesses who testified that a financial exigency existed at the University, which required personnel reductions. On the next day, the committee met again but without giving notice to Chauvin. Although the committee did not reach a decision by the usual "motion and vote" procedure, several members of the committee testified that an informal, tacit agreement was reached that the University had satisfactorily demonstrated the existence of a financial exigency which prevented retention of Chauvin in his present position. However, one member of the committee testified that he did not recall any such tacit agreement, and the committee minutes do not evidence such an agreement. On this evidence the trial court concluded that no agreement was in fact reached.

The committee concluded its work by drafting two letters to the administration. The letters contain no reference to financial exigency,[7] but stated that the University could fulfill its tenure obligations if it made greater efforts to find another position for Chauvin. In particular, the committee urged the administration to consider employing Chauvin at the Geophysical Institute where he had previously worked.

Chauvin spoke to the head of the Geophysical Institute in early July, and learned that there were two job possibilities, both involving less pay and nontenured status. For these reasons, and because he feared acceptance of such positions would compromise his claim, he rejected the offers.

After June 30, 1971, the University no longer carried Chauvin on the payroll. He continued to protest his termination and demanded a formal hearing as provided in the regulations. When the University

---

6. Hereinafter referred to as the "V–A" procedure. This procedure was first set out in Faculty Bulletin 1965–66–10, issued by President Wood on March 4, 1966. The procedure was re-established, without significant change, in Faculty Bulletin 1970–71–5, issued Jan. 27, 1971.

7. The committee tendered it recommendations in this inconclusive fashion:
   "If the Committee can be assured within the next few days that all possible effort has been expended, even to the extent of displacing a nontenured Associate or Assistant Electronics Engineer, all pertinent tenure policies will have been honored."

refused either to reinstate him or to reconvene the committee, Chauvin filed an action in superior court for damages and for reinstatement in his position.

The case was tried to the court without a jury. The court found that Chauvin was entitled to a formal hearing as provided in the regulations and since Chauvin had been deprived of several procedural rights, he was entitled to reinstatement with back pay. The court also ruled that Chauvin had no duty to mitigate his damages under the circumstances, and in the alternative that the University had failed to show the existence of alternative suitable employment opportunities commensurate with Chauvin's qualifications and training.

Each of these findings has been challenged by the University in its appeal.[8]

## THE HEARING REQUIREMENT

The University contends that Chauvin was not entitled to a hearing because he was not a member of the faculty in an academic position, a status which it contends is a prerequisite to entitlement to a hearing under the Regents' Tenure Policy.[9]

We affirm the trial court's ruling, however, finding that Chauvin was entitled to a hearing under the due process clause of the fourteenth amendment of the United States Constitution.[10] This conclusion is compelled by two recent United States Supreme Court decisions. In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court held that Roth, a nontenured teacher at a state university, had failed to show that he had a "property interest" in the renewal of his employment contract which merited the protection of the fourteenth amendment. The Court's reasoning is pertinent to the present case.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms. . . . Similarly, in the area of public employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, have interests in continued employment that are safeguarded by due process. . . .

Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that

---

8. We have reformulated appellant's assertions for the sake of clarity.

9. Without deciding the question, we note that such a strict reading would conflict with the Regents' obvious intent to extend tenurial protection to members of the faculty other than those in academic position. The provisions in pertinent part are as follows:

(3) No faculty member below the rank of assistant professor, *or full time professional personnel of equivalent status*, shall be granted tenure. (emphasis added)

(4) A member of the faculty having tenure shall be retained in his academic position unless it has been demonstrated to the satisfaction of a joint committee of faculty and administration personnel that the faculty member is incompetent, guilty of moral turpitude, or that a financial exigency preventing continued payment of his salary does exist.

Section (3) implies quite clearly that full time professional personnel who are not faculty members, but who have an equivalent university status, shall be granted tenure.

10. U.S.Const. amend. XIV, § 1 provides in part:

. . . [N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . . . .

must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." [11]

In Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court spoke once more of tenured employees.[12] Perry was a college teacher at a public school without a formal tenure system. The Court found that Perry's allegations, if proved, of a "common-law" tenure system established by custom and usage, were sufficient to entitle him to a hearing prior to termination. The Court's reasoning is again pertinent to the instant case:

"We have made clear in *Roth* . . . that 'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' . . . A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

. . .

A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a

teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown. . . .

.    .    .    .    .    .

. . . [Proof of an implied tenure system under which Sindermann has tenure] would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency." [13]

These two cases establish the law that a tenured employee of a state university has an interest in continued employment [14] which rises to the level of a property interest protected by the fourteenth amendment.[15]

Thus it is irrelevant whether the University's tenure regulations provided for a hearing to people in Chauvin's position; the fourteenth amendment gives him certain hearing rights simply because he had tenure *per se*.[16]

The University urges that even if a hearing was necessary, the hearing afforded Chauvin in this case was adequate to fulfill the University's obligation. We decline to fix in detail the range of procedural rights which must be afforded where a tenured employee does not receive a new contract because of financial exigency, because in this case the University itself set

---

11. 408 U.S. at 576–577, 92 S.Ct. at 2708, 33 L.Ed.2d at 560–561.

12. The University concedes that Chauvin has tenure; it argues only that he is not a faculty member and not in an academic position.

13. 408 U.S. at 601–603, 92 S.Ct. at 2699, 33 L.Ed.2d at 580–581.

14. The Regents' Tenure Policy provides for nonretention of tenured personnel only for adequate cause, retirement for age or disability, or because of financial exigency.

15. Although it could be argued that *Roth* and *Perry* apply only to tenured academics as opposed to nonteaching faculty or staff, there seems to be little basis for distinguishing between the employment interest of professors and engineers insofar as we are dealing with

*property* interests. It seems possible that a distinction between professors and engineers would have merit in relation to alleged *first* amendment infringements.

*See also* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (the Supreme Court applied its "property interest" analysis to welfare recipients); Bush v. Reid, 516 P.2d 1215 (Alaska 1973) (we held that the right to bring a lawsuit is a property right protected under the fourteenth amendment).

16. We also note that the trial court found that the University, as a result of it own conduct, was estopped to deny that Chauvin was entitled to a hearing. The University has not assigned error to this finding; thus there is an alternative ground for holding that a hearing was required.

up procedural guidelines for the committee.[17] Dr. Byrd, the University's legal affairs officer, instructed the committee to use the "same procedures as provided for in termination cases" in order to effectuate the Regents' Tenure Policy. This administrative interpretation was reasonable and provided an effective procedure for dealing with the matter in the absence of other specific provisions in the regulations. The committee expressly adopted these procedures, and Chauvin's reliance on these assurances is clearly established, as the trial court found.

But the University's committee failed to provide the hearing procedure which it promised. The hearings held on June 29 and 30 can only be viewed as the preliminary, informal stage, a stage which is settlement-directed rather than adjudicative. A formal proceeding was never held, despite Chauvin's repeated requests. Because formal proceedings were not held, Chauvin was denied the rights which he was promised, which rights include: fifteen days' notice, a statement of the grounds for termination and the evidence upon which the charges are grounded, the option of assistance of counsel, the right to secure the attendance of favorable witnesses and to question and confront all witnesses who testify orally, the right to have the adjudication proceeding recorded and the right to a record of the proceeding.

We conclude, as did the trial court, that Chauvin was improperly discharged and that he is entitled to reinstatement in his former position with an award of damages for unpaid salary and lost benefits.[18]

## MITIGATION OF DAMAGES

The trial court ruled that Chauvin was under no duty to mitigate his damages by obtaining other employment. Chauvin furnishes no authority to support such a rule, and it is, of course, inconsistent with the universal rule that a wronged party must use reasonable efforts to avoid the consequences of injury done by another.

Chauvin argues that the error is harmless because the trial court also found that the University failed to show the existence of alternative employment consistent with his qualifications and training. The University responds that this finding is clearly erroneous. Much evidence was presented which showed that Chauvin could have had a position as director of the Geophysical Institute's rocket range or as a research assistant, a position Chauvin held earlier in his career. Chauvin rejected both positions because they were nontenured and nonpermanent, and because he feared compromising his claim to the position he then held.

Here Chauvin is on firm ground. The positions were offered as a result of, and immediately after, the preliminary hearings on June 29 and 30. The express goal of these preliminary proceedings was to effect a compromise satisfactory to both the University and the aggrieved faculty member.[19] Only if a settlement was not reached were formal proceedings to com-

17. It seems unnecessary for us to give guidance to the University as to what is required in future proceedings to terminate for financial exigency, as the University has now promulgated regulations which provide that such hearings will be conducted in the same manner as hearings on terminations for cause. *See* Faculty Bulletin 1971–72–4, issued Feb. 25, 1972.

18. The University contends that the proper remedy is to require a valid hearing *nunc pro tunc*. But such a remedy is inappropriate where the University has breached its contractual and constitutional duties to provide continuous employment absent a valid termination. The breach of this duty mandates a remedy that places Chauvin in the position he would have occupied had the University not breached its obligation to employ—i. e. reinstatement with back pay.

19. "This augmented Committee shall make an informal inquiry, assist in arriving at an agreement if possible and, if none is effected, advise the appropriate administrative officer whether proceedings should be instituted toward a dismissal." Faculty Bulletin 1970–71–5, Sec. V–A(1).

mence. Chauvin, of course, was not obligated to pursue alternative employment offers if acceptance might compromise his claim.[20]

■■ When it became clear to Chauvin that the University would not reconvene its committee, he became obligated [21] to accept *suitable alternative employment,* even with the University, if it did not involve embarrassment or hardship, in order to mitigate his damages. But the burden of proof on this matter was on the University. It must show both that there was suitable alternative employment available and that Chauvin failed to make reasonable efforts to obtain it.[22] The University's showing was for the most part restricted to the positions offered Chauvin at a time when acceptance would compromise his claim. Although there was evidence that one of the University's job offers may have remained open for some time after the University had definitely terminated Chauvin,[23] we cannot say that the trial court's finding that the University failed to carry its burden of proving the availability of suitable alternative employment was clearly erroneous.[24]

The reinstatement ordered by the trial court does not, of course, preclude the University from further proceedings if it chooses to terminate Chauvin.

The judgment is affirmed.

---

20. *See* Redman v. State, 519 P.2d 760 (Alaska, 1974); Billetter v. Posell, 94 Cal.App.2d 858, 211 P.2d 621, 623 (1949); 5 A. Corbin, Contracts § 1043, at 274 (1964); 11 S. Williston, Contracts § 1359, at 309–10 (3rd ed. 1968).

21. Chauvin was "obligated" only in the sense that if he failed to do so, he could lose his claim for damages *pro tanto.*

22. An employee is *not obligated to accept* proffered alternative employment if it involves an increase in danger or discomfort vis-a-vis the promised position, or if acceptance of the alternative employment would involve humiliation or degradation, or if the alternative employment is essentially different from the promised position. Restatement (Second) of Agency § 455, comment d at 373 (1958); *see also* 72 A.L.R. 1049 (1931).

23. One of Chauvin's former supervisors wrote to him on July 28, 1971, informing him that, while no specific job could be offered immediately, a "niche" might be found if Chauvin pressed the issue, "though the salary might not be too wonderful." The trial court concluded that this evidence fell short of carrying the University's burden of showing that suitable alternative employment existed which Chauvin failed to pursue. We agree that this nebulous offer, which the University neglected to expand upon at trial, did not constitute a suitable employment opportunity.

24. Alaska Foods, Inc. v. American Mfr.'s Mut. Ins. Co., 482 P.2d 842, 848 (Alaska 1971).