Julia E. WEST and Peter W.
Wilska, Appellants,

v.

WHITNEY–FIDALGO SEAFOODS,
INC., Appellee.

No. 4747.

Supreme Court of Alaska.

May 8, 1981.

Russell E. Arnett, Anchorage, for appellants.

Jan Samuel Ostrovsky, Ron Birch, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Anchorage, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

MATTHEWS, Justice.

The appellant, Julia West, was the owner of a fish scow which she used to store salmon caught in the vicinity of her set net site in Trading Bay on the western shore of Cook Inlet. West's husband had purchased the scow from appellee, Whitney-Fidalgo Seafoods, Inc., in 1972. Since then it had been stored in the off season at Whitney-Fidalgo's dock in Anchorage.

Prior to 1977, West had sold all the salmon that she caught to Whitney-Fidalgo. In 1977 she decided to sell her catch to Osmar's Ocean Specialties, Inc., and made an oral contract with Osmar's to use her scow as a delivery point for fish from other fishermen who were also selling to Osmar's. On June 29, 1977, a cannery tender from Osmar's went to Whitney-Fidalgo's dock to tow West's scow to Trading Bay. The manager of Whitney-Fidalgo's Anchorage plant refused to release the scow, and subsequently presented West with a bill for $9,200.00, telling her that in order for her to regain

possession she would have to pay that sum.[1] This was the first knowledge West had of Whitney-Fidalgo's claim that she owned it money in connection with the scow.

On July 8, 1977, West filed suit seeking damages and return of the scow. On July 22, 1977, after much of the salmon fishing season was over Whitney-Fidalgo reduced its claim to $1,959.10.[2] In September, 1977, an amended complaint was filed in which West's fishing partners, Peter W. Wilska and Robert B. Wright, were added as plaintiffs.

The amended complaint contained counts brought under the Alaska Anti-Trust Act, AS 45.52.010 et seq., claims of wrongful interference with West's contract with Osmar's Ocean Specialties, Inc., and negligence and recklessness. The amended complaint sought compensatory damages, treble damages, punitive damages, and a return of the scow.

Whitney-Fidalgo's answer alleged as an affirmative defense that it was privileged to hold the scow under a personal property improvement lien pursuant to AS 34.35.175 and had the right to continue to hold the scow until its charges were paid. In addition it counterclaimed for the amount of its charges, $1,959.10.

After considerable discovery, Whitney-Fidalgo moved for judgment on the pleadings, and in the alternative, for partial summary judgment as to plaintiffs' anti-trust claims. These motions were granted by Judge Kalamarides.

Subsequently, the case was presented to a jury as one for wrongful deprivation of possession of personal property and on defendant's counterclaim. The jury found for Whitney-Fidalgo, defendant, awarding it the sum of $1,959.10.

On appeal, appellants claim numerous errors.

I

## THE ANTI–TRUST CLAIM

The amended complaint charged that defendant has in June and July 1977, and continues to wilfully conspire to restrain trade and commerce and to monopolize, or attempt to monopolize, or to combine or to conspire with another person to monopolize trade or commerce, by wrongfully depriving plaintiffs of possession and the right to use a certain fish scow owned by plaintiff, Julia E. West, for the reason that said barge would be used in competition with defendant.

This language charged violations of AS 45.52.010 and .020 which provide:[3]

45.52.010. *Combinations in restraint of trade unlawful.* Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is unlawful.

AS 45.52.020. *Monopolies and attempted monopolies unlawful.* It is unlawful for a person to monopolize, or attempt to monopolize, or combine or conspire with another person to monopolize any part of trade or commerce.

Plaintiffs' claim for treble damages was authorized by AS 45.52.110(a) which provides:

*Suits by persons injured.* (a) A person who is injured in his business or property by a violation of §§ 10, 20, 30, 40 or 50 of this chapter, or a person so injured because he refuses to accede to a proposal for an arrangement which, if consummated, would be a violation of §§ 10, 20, 30, 40 or 50 of this chapter, may bring a civil action

1. The statement was broken down as follows:

| | |
|---|---|
| Tender fees, four years | $5,300.00 |
| Labor on scow at 60 hours per year | 1,200.00 |
| Anchor cable | 300.00 |
| One anchor | 650.00 |
| Clamps, hardware | 100.00 |
| Paint, lumber | 1,450.00 |
| Crane fees—four years | 200.00 |
| TOTAL | $9,200.00 |

2. The breakdown of the reduced claim is as follows:

| | |
|---|---|
| Labor, 60 hours at $12.00 per hour | $720.00 |
| Anchor cable | 178.50 |
| Binboards | 192.00 |
| Replaced guards | 342.00 |
| Paint | 225.00 |
| Crane Fees | 93.00 |
| Tie-up lines | 10.00 |
| Spikes | 18.00 |
| Storage fees-8 months | 180.00 |
| TOTAL | 1,959.10 |

3. The relevant statutes discussed herein, AS 45.52.010; .020; .110(a) have been renumbered 45.50.562; .564; .576(a) respectively.

(1) for damages sustained by him, and if the judgment is for the plaintiff and the trier of fact finds that the defendant's conduct was wilful, the plaintiff shall be awarded threefold the amount of damages sustained by him, plus the costs of the suit, including reasonable attorney fees; ...

As previously indicated, Whitney-Fidalgo moved for judgment on the pleadings and, in the alternative, for partial summary judgment as to the claims based on AS 45.52.010 and AS 45.52.020. Plaintiffs consented to summary judgment as to the allegations made under AS 45.52.010, and their claim based on that section was eliminated from the case.

Whitney-Fidalgo, in its motion for judgment on the pleadings concerning the AS 45.52.020 allegations of monopolization and attempt to monopolize, contended that the claim was deficient because it contained no allegation of the relevant market which Whitney-Fidalgo had allegedly either monopolized or attempted to monopolize, and no allegation that the attempt charged had a "dangerous probability of success" in bringing about a monopoly.

In its alternative motion for summary judgment, Whitney-Fidalgo argued that the entire Cook Inlet should be considered the relevant market and that it did not have a monopoly in that market. Whitney-Fidalgo noted that it "is a dominant buyer because it has the only cannery in Anchorage, but it has not controlled prices or excluded competition." According to Whitney-Fidalgo, for the 1976 salmon season there were eighteen purchasers of salmon in Cook Inlet; it purchased approximately twenty-one percent of the catch that year. There were twenty purchasers in 1977, and it purchased approximately thirty percent of that year's catch. Thus, Whitney-Fidalgo argued that it was undisputed that it did not have a monopoly in Cook Inlet, and further asserted that its market share for those years was "not sufficient to show a dangerous probability of success in an alleged attempt to monopolize the Cook Inlet area salmon market."

Plaintiffs combined their response to Whitney-Fidalgo's motions. Germane to the motion for judgment on the pleadings, they argued that an allegation of the relevant economic market and an allegation that there existed a dangerous probability of monopolization of such a market were not essential to an attempt to monopolize claim under section .020. With respect to the summary judgment motion plaintiffs argued that the relevant market was the Upper Cook Inlet area and that defendant's market power there was sufficiently shown by the fact that it "has the only salmon cannery in the Upper Cook Inlet."

The plaintiffs in their statement of genuine issues suggested that the following acts of Whitney-Fidalgo, in addition to holding the scow, provided evidence of an attempt to monopolize the salmon market in the Upper Cook Inlet: 1) providing in a draft of a written contract with the Cook Inlet Fishermen's Association a provision that all salmon caught by Association members would be sold exclusively to Whitney-Fidalgo; 2) inserting in the initial contract of sale for the scow with Julia West's husband, Martin, a requirement that Martin fish for the company for four years; 3) threatening representatives of the Cook Inlet Fishermen's Association that if any fisherman did not sell all his catch to Whitney-Fidalgo, it would remove its fish scow from the area fished by the Cook Inlet Fishermen's Association members and purchase no fish from them. These allegations were supported by sworn testimony in the record.

The trial court largely accepted Whitney-Fidalgo's argument concerning the motion for judgment on the pleadings. The court concluded:

Based upon plaintiffs' failure to properly allege either that defendant had the specific market power to come dangerously close to succeeding in their attempts to monopolize or that defendant's attempted monopolization was with respect to a specified and relevant market area, I find

that plaintiffs' first cause of action is insufficient to maintain a claim under AS 45.52.020.

In the alternative, the court concluded as a matter of fact that the relevant market was not Upper Cook Inlet since that market area was not "sufficiently distinct in commercial reality to permit defendant to exclude competition and control prices." The court noted that "the existence of alternative buyers further down the Inlet would have negated the defendant's ability to exclude competition or control prices within the defined area, thus relieving them from liability . . . ." The court thus dismissed all of the plaintiffs' anti-trust claims.

On appeal West and her partners do not claim that error was committed in dismissing their monopolization claims. They do contend, however, that their attempt and conspiracy to monopolize claims should have been presented at trial. Before the superior court, however, they did not argue that they had a valid conspiracy to monopolize claim, and thus they have waived the right to make that assertion here.[4] The upshot of this is that the only anti-trust theory that is presented to us is that of attempt to monopolize.

The legislative history of the Alaska Anti-Trust Act indicates that section .020 is based on section 2 of the Sherman Anti-Trust Act.[5] The legislature intended that Alaska courts would look to Sherman Act cases in construing the Act.[6]

 There is a distinct disagreement among the federal circuits as to whether proof of an economic market and proof of a dangerous probability of monopolization of such a market are required elements of an attempt to monopolize.[7] In *Swift and Company v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905), Mr. Justice Holmes, writing for the court, stated with respect to the attempt provision of section 2 of the Sherman Act:

> Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result. [Citation omitted]

196 U.S. at 396, 25 S.Ct. at 279, 49 L.Ed. at 524.

Not every act that may be done with intent to produce an unlawful result is unlawful, or constitutes an attempt. It is

---

**4.** Contentions not made before the superior court may not be used on appeal to overturn the judgment of the court. *See University of Alaska v. Simpson Building Supply Co.*, 530 P.2d 1317, 1324 (Alaska 1975); *Moran v. Holman*, 501 P.2d 769, 770 n. 1 (Alaska 1972).

**5.** Section 2 of the Sherman Act provides:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony
. . . .
15 U.S.C.A. § 2.

**6.** The legislative committee report to AS 45.52.-020 provides in part:
Sections 10 and 20 of the judiciary committee substitute, as in the commerce committee substitute, employ the language of sections I and II of the federal Sherman Act to prohibit

agreements in restraint of trade, monopolization, and attempts and conspiracies to monopolize. In using the federal language the committee intends that federal precedent under the Sherman Act provide a guide to the interpretation and construction of the state Act. In particular, the committee recognizes and intends to adopt the federal case law under section II of the Sherman Act which requires that predatory intent be present before a violation of section 20 of the bill is found.

**7.** Discussions of this problem are contained in E. Cooper, *Attempts in Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of § 2*, 72 Mich.L.Rev. 373 (1974); 3 P. Areeda and D. Turner, Antitrust Law §§ 820–839 at 311–359 (1978); L. Sullivan, Antitrust §§ 49–52, at 132–140 (1977).

a question of proximity and degree. The distinction between mere preparation and attempt is well known in the criminal law. The same distinction is recognized in cases like the present. [Citation omitted]

196 U.S. at 402, 25 S.Ct. at 281, 49 L.Ed. at 527.

Most federal circuits have construed *Swift* to require a dangerous probability of success as a necessary element of the attempt offense in addition to specific intent.[8] Dangerous probability of success is shown by significant market power at the time of the anti-competitive conduct.[9] Identification of the relevant market is necessary in order to make a determination of the defendant's market power.[10]

However, the rule in the Ninth Circuit Court of Appeals is that proof of relevant market and of a dangerous probability that such market will be monopolized are not indispensable elements of the attempt offense. The focus is on anti-competitive intent and conduct, not the possibility of successful monopolization and therefore the relevant market is not an essential issue. "[A] prima facie case of attempt to monopolize is made out by evidence of a specific intent to monopolize 'any part' of commerce, plus anti-competitive conduct directed to the accomplishment of that unlawful purpose." *Greyhound Computer v. International Business Machines*, 559 F.2d 488, 504 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *see also Knutson v. Daily Review, Inc.*, 548 F.2d 795, 813–14 (9th Cir. 1977), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *Twin City Sportservice, Inc. v. Charles O.*

*Finley's, Co.*, 512 F.2d 1264, 1276 (9th Cir. 1975); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474 (9th Cir. 1964), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). However, market position is not irrelevant under the Ninth Circuit rule. The more market power that exists, the more likely it is that a given course of questionable conduct will suggest the existence of intent to monopolize. *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 669 (9th Cir. 1980).

The Ninth Circuit has recently expressed the rationale for its rule as follows:

If proof of an economic market, technically defined, and proof of a dangerous probability of a monopolization of such a market were made essential elements of an attempt to monopolize, as a practical matter the attempt offense would cease to have independent significance. A single firm that did not control something close to 50% of the entire market, would be free to indulge in any activity however unreasonable, predatory, destructive of competition and without legitimate business justification. Any concern not dangerously close to monopoly power could deliberately destroy its competitors with impunity. These are not abstract hypotheses. A market share approaching monopoly is not required to enable one concern seriously to impede the capacity of others to compete by use of abusive trade practices. A construction of the Sherman Act that would immunize such practices would be contrary to the purposes of the Act; it is not required by the Act's language or legislative history.

---

8. *See, e. g., Coleman Motor Co. v. Chrysler, Corp.*, 525 F.2d 1338, 1348 (3rd Cir. 1975); *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.*, 508 F.2d 547, 550 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Agrashell, Inc. v. Hammons Products Company*, 479 F.2d 269, 285 (8th Cir. 1973), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973) and 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

9. P. Areeda and D. Turner, *supra* note 7, § 820 at 312.

10. *See e. g., George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 550 (1st Cir. 1974) (potential exercise of power ... must be assessed in the context of a relevant market); *Diehl and Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110, 120 (E.D.N.Y. 1976).

*Greyhound,* 559 F.2d at 504. We find this reasoning to be both persuasive and consistent with what we regard as the soundest reading of the *Swift* case:

> Holmes was doing no more than proposing the common law of attempts as a guide, and that guide, surely, does not insist that the criminal actor be within range of success, but only that he have externalized his unlawful animus in a deliberate effort to bring it to actuality. Once he has done that, the law steps in on the ground that by deliberately trying to commit the crime, the actor has shown a serious risk that if not deterred he may persist in his efforts until he succeeds.

L. Sullivan, Antitrust § 51, at 137–38 (1977).

For these reasons we adopt the rule that proof of the relevant market and a probability of its monopolization are not essential elements of the offense of attempt to monopolize under § .020.[11] We believe that Whitney-Fidalgo's acts may be viewed by the trier of fact as having been motivated by a desire to obtain, or maintain, a position as a monopoly buyer of salmon from Upper Cook Inlet set netters. We therefore hold that the superior court erred in dismissing plaintiffs' attempt to monopolize claim.

## II

## THE WRONGFUL DEPRIVATION OF PROPERTY CLAIM

Plaintiffs also claim that the jury was erroneously instructed with respect to the legal prerequisites for detaining property held by another.

AS 34.35.175(a) grants a possessory improvement lien on personal property under certain circumstances. It provides:

> *Improvement lien on personal property.* (a) A person who makes, alters, repairs or labors upon an article of personal property at the request of the owner or lawful possessor has a lien on the property for his just and reasonable charges for the labor performed and material furnished. The person may keep possession of the article until the charges are paid.

AS 34.35.220(2) grants a possessory storage lien:

> *Persons entitled to carrier, warehouse, and livestock liens.* The following persons shall have liens upon personal property for their just and reasonable charges for the labor, care, and attention bestowed and the food furnished, and may retain possession of the property until the charges are paid:
>
> . . . . .
>
> (2) a person who safely keeps or stores grain, wares, merchandise, and personal property at the request of the owner or lawful possessor of the property; . . .

The court instructed the jury that Whitney-Fidalgo would be justified in refusing to deliver the scow if West then "owed the defendant money for storage, maintenance, repairs, supplies, and/or services for her scow."

As to the claims of Wright and Wilska, the court instructed the jury that Whitney-Fidalgo would be justified in refusing to deliver the scow to West if she owed the company money for storage, maintenance, supplies and/or services for her scow *or* that Whitney-Fidalgo honestly believed that West owed it money for such items.

Plaintiffs had requested instructions that Whitney-Fidalgo's right to retain possession of the scow could be established only upon proof, among other things, "that defendant's charge was reasonable for the labor performed or the materials furnished."

---

11. Whitney-Fidalgo argues in its brief that its 30% market share is evidence of insufficient market power for it to have a substantial probability of achieving monopoly status, and, therefore, it could not be guilty of attempt under the majority rule. Although our decision today moots the issue, we note Areeda and Turner's discussion at ¶ 835, pointing out that in jurisdictions which have adopted the majority rule a market share as low as 20% has been found sufficient for an attempt, and that firms with 40% and higher shares are commonly held to have enough power to be guilty of section 2 violations. Areeda and Turner recommend the adoption of a rule of presumptive dismissal of all cases where the defendant's share is below 30%, and a presumptive finding of "probability of success" where the defendant's share exceeds 50% and his conduct meets certain requirements.

■ The question presented is therefore whether Whitney-Fidalgo lost its right to retain the scow if its claim was unreasonable. The answer supplied by the cases is that mere excessiveness of an amount claimed does not void the lien if, 1) the lienor believes the amount is correct, and 2) the owner has not been prejudiced by the excessive demand. *Mercer Steel Co. v. Park Construction Company*, 242 Or. 596, 411 P.2d 262, 264 (1966); *Drake Lumber Co. v. Paget Mortgage Co.*, 203 Or. 66, 274 P.2d 804, 811 (1954); *Power Transmission Equipment Corp. v. Beloit Corp.*, 55 Wis.2d 540, 201 N.W.2d 13, 16 (1972). One type of prejudice which will operate to discharge an excessive claim of lien made in good faith occurs where the owner of the property detained is prevented by the excessiveness of the amount claimed from obtaining the property by paying the actual amount due, and thereby suffers damage. *Folsom v. Barrett*, 180 Mass. 439, 62 N.E. 723 (1902); *Stephenson v. Lichenstein*, 72 N.J.L. 113, 59 A. 1033 (1905); *Simons v. Brashears Transfer and Storage*, 344 P.2d 1107, 1112 (Okl. 1959).

■ Since neither plaintiffs' proposed instructions nor their objections referred to these principles, it is doubtful whether a new trial would be warranted by reason of the court's failure to instruct on them.[12] However, because this case must be retried, and because the nature of defendant's conduct in detaining the scow will be a central issue at the trial, we think that justice can best be done by resubmitting to the jury upon proper instructions the question of defendant's right to detain the scow.

12. Alaska R.Civ.P. 51(a) provides in part:
 No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.
 In construing this rule we have held that where an instruction is objected to, reasons for the objection must be expressed and, on appeal, only those reasons will be reviewed, not others that later occur to counsel. *Nordin Constr. Co. v. City of Nome*, 489 P.2d 455, 471–72 (Alaska 1971). However, in *Pepsi Cola Bottling Co. v.*

III

## CLAIMS OF ERROR RELATING TO DAMAGES

Plaintiffs raise two claims of error relating to damages which merit brief discussion, since the rulings on which they are based may occur again upon retrial.

■ West testified that she had fished on the same set net site for many years and she knew that it was comparable in productivity to those of her neighbors. She then sought to introduce the earnings of her neighbors during the 1977 fishing season, based on what they had told her, in an effort to prove her own lost earnings. This testimony was excluded on the basis of hearsay. We do not regard the court as having erred in so ruling. Plaintiffs characterize the court's ruling on this point as a general refusal to allow West to estimate her lost profits, but this interpretation does not square with those portions of the record to which we have been referred. We believe, however, that if West had been asked to testify as to an estimate of her lost 1977 earnings, such testimony could have been allowed if the estimate was based on her observations of the fish run and the magnitude of her neighbors' catches, her own experience fishing on the site, her participation in the 1977 fishery and her knowledge of how the lack of the scow interfered with her 1977 efforts. *See City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 224 (Alaska 1978); *Dowling Supply & Equipment Co. v. City of Anchorage*, 490 P.2d 907, 909 (Alaska 1971).

*Superior Burner Serv. Co.*, 427 P.2d 833 (Alaska 1967), we stated:
 Numerous authorities have concluded that if the defective, or erroneous requested instruction directs the court's attention to an issue which the jury has not been instructed upon but which is necessary to enable the jury to intelligently determine the case, "the court's error in failing to charge may not be excused by technical defects in a request to charge." 427 P.2d at 837, quoting 2B Barron & Holtzoff, Federal Practice and Procedure § 1102, at 447–48 (rev. ed. 1961).

Another claim of error concerns lost revenues for the 1978 salmon season. The court ruled that 1978 lost revenues could not be considered by the jury because "reasonable minds could not differ [that West] could have bailed that scow out of Whitney-Fidalgo's possession prior to the 1978 fishing season." We disagree for the reasons that follow.

■ A plaintiff must make reasonable efforts to minimize damages. However, this duty does not extend to subjecting oneself to undue risk or expense. 11 S. Williston, Law of Contracts, § 1353 at 274 (Jaeger 3d Ed.1968). *See University of Alaska v. Chauvin*, 521 P.2d 1234, 1240 (Alaska 1974). What is a reasonable effort is a question of fact as is undue risk or expense. However,

> almost any risk of considerable loss to the injured person if he attempts to mitigate damages should be considered undue; and though where a small pecuniary expense will obviously operate as a great diminution of loss, a failure to make the ·expenditure may result in diminishing the damages to which the plaintiff is entitled to the amount that would have been recoverable if the expenditure had been made, yet the expenditure must be small and the loss saved thereby certain and great in comparison.

S. Williston, *supra*, at 277–78. Further, a plaintiff's lack of money to make a needed expenditure should be considered. *Id.* at 278. The burden of proving that the plaintiff has unreasonably failed to minimize damages falls upon the defendant. *Chauvin*, 521 P.2d at 1240.

■ Whitney-Fidalgo contends that West could readily have obtained possession of the scow by posting a bond "via a simple statutory procedure, AS 09.40.260 et seq." One difficulty with this argument is that the bond required under the statute must be for double the value of the property [13] and we have not been referred to any testimony concerning the value of the scow. Thus it is difficult to assess whether obtaining a bond would have been beyond West's means.

■ The court's theory differed from Whitney-Fidalgo's. The court believed that West could have obtained the scow by posting a bond for the amount of the lien claim plus costs and attorney's fees. While ordering the release of the property pursuant to such a bond does not accord with AS 09.40.-270, we have no occasion here to doubt the propriety of such an order.

On and after July 22, 1977, Whitney-Fidalgo's possessory lien was $1,959.10. The evidence concerning West's financial status was that at one point in the summer of 1977 she had a bank account with a balance of $2,000.00. She owned a one-half interest in a home in Florida which was not mortgaged. The house had been assessed "some years back" at $17,000.00. West was a widow who supported herself by house cleaning and set net fishing. On this sparse record we believe that a question of fact was presented as to whether or not West unreasonably failed to obtain the release of the scow. The cash that she had in 1977 may have been needed for necessary living expenses. It is possible that she might have mortgaged the house in which she had a one-half interest in order to obtain the needed funds. Her ability to do so would probably be contingent on the consent of the co-owner. Assuming that such consent could have been obtained, not all reasonable people would necessarily conclude that the risk and expense of mortgaging were worth the loss to be saved.

We have reviewed the other claims of error urged by the plaintiffs and find them to be without merit.

REVERSED AND REMANDED.

---

13. AS 09.40.270 provides:

*Undertaking.* A peace officer shall not take personal property into custody until the plaintiff delivers to him the affidavit and undertaking of sufficient sureties to the effect that they are bound in double the value of the property for the prosecution of the action and the return of the property to the defendant if return be adjudged, and for the payment to the defendant of any sum which may be recovered against the plaintiff.