NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>*. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

BRENNAN ADAM GRUBB,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13074
Trial Court No. 3AN-14-09600 CR

O P I N I O N

No. 2817 — October 10, 2025

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for the Appellant. Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge WOLLENBERG, writing for the Court and concurring separately.
Judge ALLARD, concurring.

This case is before us for a second time, following remand from the Alaska Supreme Court.[1]

Brennan Adam Grubb pleaded guilty to sexual abuse of a nine-year-old boy, M.M. As part of the plea agreement, Grubb agreed to pay restitution in an amount determined by the superior court.

Following Grubb's offenses, M.M. was diagnosed with post-traumatic stress disorder, and M.M.'s mother, T.R., resigned from her job as a public school teacher to care for him. The State requested restitution in the amount of $216,307.55, the majority of which was intended to compensate T.R. for her future lost wages and benefits. After holding an evidentiary hearing, the court awarded the requested restitution.

Grubb appealed the award of future lost wages and benefits on several grounds.[2] In our initial opinion in this case, we vacated the award on one such ground, concluding as a matter of law that Grubb's criminal conduct was not the proximate cause of T.R.'s future lost wages and retirement benefits.[3]

The Alaska Supreme Court reversed our decision, holding that we erred in concluding, as a matter of law, that Grubb's criminal conduct was too attenuated from T.R.'s lost wages and retirement benefits to satisfy the proximate causation requirement.[4] The supreme court also held that T.R.'s claim for future lost income was reasonably quantifiable and not speculative.[5] The court remanded Grubb's case to this

---

[1]  *See State v. Grubb*, 546 P.3d 586 (Alaska 2024).

[2]  Grubb did not contest the remainder of the restitution award on appeal.

[3]  *Grubb v. State*, 506 P.3d 791 (Alaska App. 2022), *rev'd*, 546 P.3d 586 (Alaska 2024).

[4]  *Grubb*, 546 P.3d at 600-03.

[5]  *Id.* at 599, 603.

Court with directions to consider "Grubb's remaining challenges to the restitution award, including his excessive-fines and duty-to-mitigate arguments."[6]

We now address each of Grubb's remaining claims. For the reasons we explain in this opinion, we reject most of Grubb's claims, with one exception: we remand this case to the superior court to reduce relevant portions of the restitution award to present value.

*Factual and procedural background*

In October 2014, Brennan Adam Grubb was charged with five counts of attempted first-degree sexual abuse of a minor for engaging in multiple sexual acts with nine-year-old M.M.[7] Grubb, who was sixteen years old at the time of the offenses, was automatically charged as an adult pursuant to AS 47.12.030(a)(1).

Pursuant to an agreement with the State, Grubb pleaded guilty to an amended charge of one count of second-degree sexual abuse of a minor, and the State dismissed the remaining charges.[8] Grubb admitted to the conduct alleged in the original complaint, which included several acts of sexual penetration. Sentencing was left open to the court, with Grubb waiving his right to a jury trial on any applicable aggravating factors. At sentencing, the court found two aggravating factors and imposed a sentence of 30 years with 20 years suspended (10 years to serve) and a 10-year term of probation. As part of his plea agreement, Grubb also agreed to pay restitution in an amount to be determined later by the superior court.

As we detailed in our original opinion, the State initially filed a proposed restitution judgment in the amount of $20,700.35. Seven months later, the State filed an

---

[6] *Id.* at 603-04.

[7] AS 11.41.434(a)(1) & AS 11.31.100(a).

[8] AS 11.41.436(a)(2).

amended restitution judgment seeking a total of $216,307.55 — $9,003.31 to the Alaska Violent Crimes Compensation Board to reimburse it for past payments made to T.R. and $207,304.24 to T.R. The bulk of the proposed restitution to T.R. was for future lost wages and benefits: $52,144 for T.R.'s estimated diminished future salary and $144,894 for T.R.'s corresponding diminished retirement benefits.[9] Together with its amended restitution judgment, the State filed a document prepared by T.R. outlining how she had calculated her future losses.

Grubb objected to portions of the proposed restitution judgment, including the claim for T.R.'s future lost wages and benefits. Grubb argued that the claim for future lost wages and benefits was outside the permissible scope of restitution, lacked a causal relationship to Grubb's criminal conduct, and was speculative. The superior court held an evidentiary hearing, at which T.R. testified regarding the impact of Grubb's abuse on her and her son and the calculation of her financial losses. This testimony was detailed in our original opinion and the opinion of the supreme court; we summarize it again here.

T.R. testified that M.M. first told her about Grubb's abuse in September 2014, at the beginning of her sixteenth year as a public school teacher. According to the testimony of M.M.'s therapist and T.R., following the abuse, M.M. was diagnosed with post-traumatic stress disorder, had trouble feeling safe at home, and struggled with school. M.M.'s needs were time-consuming, and T.R. explained that attending to them often disrupted her teaching and caused her to be late for work. During the fall semester, her supervisor allowed her to drop her first period class to care for M.M. in the

---

[9] The remaining restitution to T.R. was for M.M.'s past counseling costs, installation of a home security system, and a portion of T.R.'s past lost wages that had not been compensated by the Violent Crimes Compensation Board.

mornings,[10] but by the spring semester, there was little flexibility in her schedule, and she was being reprimanded for arriving late to work. T.R. was ultimately unable to balance M.M.'s needs with her teaching responsibilities and her own well-being, and she resigned from her position as a middle school teacher at the end of the 2014-15 school year to better support M.M.

After T.R. resigned from her teaching position, she made herself available to M.M. as needed; for example, she would bring him to school, have lunch with him, and "tried to spend a lot of time in [his] classroom." T.R. applied to return to the school district as a teacher in the spring of 2017, but the school system was experiencing layoffs and she did not receive any interviews.

T.R. testified that, before deciding to resign to care for M.M., she had planned to teach for at least four more years, as she would become eligible for early retirement after twenty years. According to T.R., her resignation impacted her progress along the school district's salary scale, which in turn affected the amount of her retirement benefits. If she returned to teaching, she would receive some credit for her previous experience, but she would not be restored to her former pay grade. T.R.'s calculations assumed that she would receive six years of work credit, rather than the sixteen years she had actually worked.[11]

---

[10] This led to a 20% reduction in T.R.'s pay, which was reimbursed in part by the Violent Crimes Compensation Board.

[11] The evidence was somewhat uncertain about the amount of prior service credit T.R. would receive if she returned to teaching. T.R. explained that the amount of prior service credit a new hire could receive was a "contractual issue" between the teacher's union and the school district that could change from year to year. Initially, T.R. intended to calculate her new salary assuming that she would get five years of work credit. But she realized during her testimony that she mistakenly gave herself credit for six years, which meant she estimated a higher return-to-work salary (and thus a smaller differential in future lost wages).

2817

T.R. explained how she calculated her future lost wages and benefits. As to her future lost wages, T.R. testified that the amount she was requesting — $52,144 — represented the difference between what she believed she would have earned over a four-year period had she not resigned and what she believed she would earn over a four-year period if she returned to teaching during the 2016-17 school year at a reduced salary. T.R. assumed a 2.5% pay raise each year based on information she received from the Anchorage Education Association about the average annual salary increase.

As to her retirement benefits, T.R. testified that, had she continued teaching, she would have been able to retire at age forty-two, and — based on her estimate that women in Alaska have an average life expectancy of eighty years — she calculated that she "could be losing out on as much as $144,894." T.R.'s school district retirement benefits would be calculated using the three years for which her salary was highest; T.R. thus arrived at her proposed figure by calculating the difference between her retirement payments using her expected three highest salary years had she not resigned and her retirement benefits based on what she expected her three highest salary years to be if she returned to teaching.

T.R. testified, "I can say with 100% certainty that I left teaching because of Mr. Grubb's actions." She acknowledged that she had the option of taking a leave of absence to care for M.M. instead of resigning. But she testified that district policies prohibited her from pursuing any other work while on leave, including her part-time work as a realtor, and she was told she would have had no control over the time frame of her return or the position to which she returned, making a leave of absence an "impossible option" for her. T.R. testified that, prior to her resignation from the school district, she was working as a realtor during the evenings, weekends, and summers and had planned to work as a realtor after retirement from the school district.

Following the restitution hearing, Grubb's attorney argued that there was an "insufficient nexus" between the harm to M.M. and T.R.'s decision to resign — namely, that Grubb's criminal conduct was not the proximate cause of T.R.'s future lost

wages and benefits and that the claims were speculative.[12] Grubb's attorney suggested that the reason T.R. resigned was unclear and could have been motivated by her desire to shift to realtor work.

The superior court issued a written order granting the requested restitution in full.[13] The court noted that the primary issue was whether Grubb's criminal conduct was the proximate cause of the restitution claim. The court credited T.R.'s testimony that she "left teaching because of Mr. Grubb's actions" and found that T.R.'s "testimony and calculations were credible, accurate, and thorough." The court concluded that the claim for restitution was supported by a preponderance of the evidence.

Grubb moved for reconsideration, noting that M.M. was not confined to home care, T.R. shared custody of M.M. with her ex-husband, and the court had awarded restitution for damages forty years into the future. The superior court denied the motion for reconsideration.

Grubb appealed the restitution judgment to this Court, contesting the award to T.R. for her future lost wages and retirement benefits. (Grubb did not contest the remaining portions of the restitution judgment.) Grubb raised several claims. First, Grubb argued that the superior court failed to properly evaluate whether Grubb's criminal conduct was the proximate cause of the future losses. Second, Grubb argued that the losses were too speculative to be compensable, that the superior court failed to consider whether the losses were mitigated by T.R.'s real estate career, and that the

---

[12] Grubb also argued that the future lost salary and retirement benefits claims — which were first requested a year and a half after Grubb's sentencing and seven months after the initial restitution judgment was filed — were untimely and should be denied on that ground. The court declined to do so.

[13] There are references in the record to the Violent Crimes Compensation Board having withdrawn its request for reimbursement, but the prosecutor encouraged the court to include reimbursement for that amount in the final judgment, and it is included in the total restitution ordered by the court.

future losses should be reduced to present value. Finally, Grubb argued, for the first time on appeal, that — in the event T.R.'s future lost wages and benefits were validly subject to a restitution order under state law — this portion of the restitution judgment violated the prohibition on excessive fines under the United States and Alaska Constitutions. As part of this argument, Grubb contended that the constitutional prohibition on excessive fines mandated consideration of his ability to pay.

We reversed the restitution award for future lost wages and benefits, concluding that, although T.R.'s decision to resign from her job to care for M.M. was understandable, the law did not authorize compensation for future lost income under these circumstances.[14] We relied on two Alaska Supreme Court decisions[15] and the majority rule from other jurisdictions[16] in holding that "these types of losses, which hinge on a sense of personal obligation [by one family member to another] that is difficult to quantify, are too uncertain and attenuated from the underlying harm to be compensable in a civil suit."[17] We noted that we had previously recognized, in *Ned v. State*, that a person injured by a defendant's criminal conduct may not recover more in

---

[14]  *Grubb v. State*, 506 P.3d 791, 798-99 (Alaska App. 2022), *rev'd*, 546 P.3d 586 (Alaska 2024).

[15]  *See Heritage v. Pioneer Brokerage & Sales, Inc.*, 604 P.2d 1059, 1064-65 (Alaska 1979) (holding that a husband could not recover wages lost as a result of his decision to leave a higher-paying job in favor of a different job in order to provide care for his wife after she was exposed to toxic fumes in a mobile home they had purchased); *Glamann v. Kirk*, 29 P.3d 255, 264-65 (Alaska 2001) (holding that the wage losses caused by a wife's decision to transport her husband to his medical appointments after a car accident were not compensable in a lawsuit based on the driver's negligence).

[16]  *See, e.g.*, *Hutchings v. Childress*, 895 N.E.2d 520, 525-26 (Ohio 2008) (citing 2 Jacob A. Stein, *Stein on Personal Injury Damages* § 7:11, at 7-30 (3d. ed. 1997)); *see also id.* at 523 (noting the general rule in civil cases that a parent can recover damages for the cost of care provided to their injured child, but not for the parent's lost wages in providing that care).

[17]  *Grubb*, 506 P.3d at 796-97.

criminal restitution than in a corresponding civil case based on the same conduct,[18] and we therefore held that the rule limiting liability under these circumstances in civil cases applied to Grubb's case.[19] In short, we held that "T.R.'s decision involved too many indeterminate variables to render the resulting wage and benefit losses recoverable as a matter of law."[20]

Because we concluded that T.R.'s future lost salary and benefits were not compensable under Alaska law, we did not reach Grubb's other challenges to the award of these costs.

The State filed a petition for hearing in the Alaska Supreme Court, and the supreme court reversed our decision.[21] The supreme court did not hold that these types of damages — future lost wages and benefits resulting from a family member's decision to resign from work to care for a family member — would necessarily be compensable in a civil lawsuit. Rather, the supreme court held that "although civil damages concepts are often informative [in determining criminal restitution], the process of determining proximate cause in a criminal case can involve different considerations than those in a civil suit."[22]

In particular, the supreme court relied on two primary distinctions from civil damages concepts. First, the court relied on the fact that, as the parent of a minor victim, T.R. was herself a statutory victim under AS 12.55.185(19)(B)(ii) — a statutory

---

[18]   *Id.* at 795 (citing *Ned v. State*, 119 P.3d 438, 446-47 (Alaska App. 2005)).

[19]   *Id.* at 798.

[20]   *Id.* ("While T.R. no doubt made decisions that she felt best for her and her son, those types of personal decisions hinge on indeterminate factors and preferences that make assigning legal damages an inherently uncertain task.").

[21]   *State v. Grubb*, 546 P.3d 586 (Alaska 2024).

[22]   *Id.* at 593.

status that had no analog under civil law.[23] The court also noted the unique nature of the parent-child relationship relative to the spousal relationships at issue in their prior civil cases.[24]

Second, the court pointed to the Alaska legislature's stated purpose of making "full restitution available to all persons who have been injured as a result of criminal behavior, to the greatest extent possible."[25] The court noted that "[t]he legislature ha[d] not adopted a similar directive encouraging courts to consider the public policy favoring compensation when calculating damages in tort."[26]

Given the legislature's command to interpret the criminal restitution statute broadly, the supreme court interpreted the definition of "victim" (which includes the parents of minor victims)[27] "to permit some individuals who, in the civil context, would not be able to assert an independent claim to seek the same restitution as a traditional 'direct' victim of crime."[28] Stated differently, the court held that "[a] parent whose child is a crime victim may . . . assert a direct claim for restitution for providing care to the child, unlike an adult caregiver seeking civil damages for providing services to a spouse."[29]

---

[23]  *Id.* at 596-99.

[24]  *Id.* at 597-600.

[25]  *Id.* at 595-96 (quoting SLA 1992, ch. 71, § 1); *see also Lonis v. State*, 998 P.2d 441, 447 n.18 (Alaska App. 2000) (noting the legislature's intent for courts to construe the restitution statute broadly to require the payment of restitution to all persons who have been injured by the defendant's criminal conduct).

[26]  *Grubb*, 546 P.3d at 598.

[27]  AS 12.55.185(19)(B)(ii).

[28]  *Grubb*, 546 P.3d at 596-97.

[29]  *Id.* at 597. The supreme court emphasized that a victim's "actual damages" are the measure of restitution. *Id.* at 601-02 (quoting AS 12.55.045(n)). The court rejected the notion that the fair market value of caregiving services provided to the child, as opposed

Ultimately, while acknowledging that the theory of liability in Grubb's case relied on "an extended chain of causation," the supreme court rejected our conclusion that Grubb's criminal conduct was not, as a matter of law, a proximate cause of T.R.'s loss of future wages and benefits.[30] And deferring to the superior court's determination that T.R.'s calculations were "credible, accurate, and thorough," the supreme court also found that T.R.'s damages were reasonable and "firmly established."[31]

Following the supreme court's remand to this Court, we sought supplemental briefing from the parties addressing the impact of the Alaska Supreme Court's decision on the remaining claims raised in this case. We also directed Grubb to specify the claims that remained to be decided. In his supplemental briefing, Grubb identifies three main disputed issues that we are still required to address: whether the superior court (1) failed to find that Grubb's conduct was the proximate cause of T.R.'s future lost earnings, (2) erred in failing to consider whether T.R. mitigated her losses, and (3) plainly erred in failing to find that the restitution award violated the constitutional prohibition against excessive fines. The parties largely agree on a fourth issue — that a portion of the restitution award must be reduced to present value. We address these issues in turn.

---

to a parent's lost wages, provided a more uniform measurement of restitution, while still recognizing that the cost of caregiving services might be the proper basis for a restitution award in a given case "if a family hired a caregiver or . . . incurred caregiving costs." *Id.* at 602-03.

[30] *Id.* at 601.

[31] *Id.* at 603 (quoting *Lawrence v. State*, 764 P.2d 318, 322 (Alaska App. 1988)).

*Grubb's argument that the superior court failed to make a finding that his conduct was the proximate cause of T.R.'s future lost earnings*

In his original briefing to this Court, Grubb argued that the superior court never made a proximate cause finding, and instead found only that Grubb's conduct was the "but for" cause of T.R.'s future losses. That is, Grubb argued that the superior court applied the wrong legal test in deciding whether to award restitution. In our initial opinion, we did not address this issue because we held, as a matter of law, that Grubb's conduct was not a proximate cause of T.R's future lost income.[32] But our ruling on this point was reversed,[33] and Grubb now renews his argument that the superior court failed to make a finding of proximate causation.

Having reviewed the superior court proceedings, we reject Grubb's argument. Under Alaska law, an award of criminal restitution requires not only a showing of "but for" causation between the defendant's criminal conduct and the losses incurred (the cause-in-fact), but also a showing of proximate (or legal) causation.[34] The memorandum Grubb's attorney filed with the superior court before the restitution hearing explained this point — *i.e.*, the attorney stated that the superior court was

---

[32] *Grubb v. State*, 506 P.3d 791, 798 (Alaska App. 2022), *rev'd*, 546 P.3d 586 (Alaska 2024).

[33] *Grubb*, 546 P.3d at 589 (holding that T.R.'s "resignation from her teaching position was a reasonably foreseeable consequence of Grubb's criminal conduct"); *see also id.* at 601 (recognizing that "[i]t is foreseeable that a parent would forgo opportunities, including employment opportunities, to care for an injured child victim").

[34] *Id.* at 592-93 (recognizing that "[a]wards of restitution in a criminal case . . . require a showing of proximate cause"); *Peterson v. Municipality of Anchorage*, 500 P.3d 314, 321 (Alaska App. 2021) ("Alaska employs a test of proximate causation in evaluating claims for restitution in a criminal case."); *see also Howarth v. State, Pub. Def. Agency*, 925 P.2d 1330, 1333 (Alaska 1996) (explaining that "legal cause encompasses two concepts" — actual ("but for") causation and causation grounded in legal policy, which asks "whether the conduct has been so significant and important a cause that the defendant should be legally responsible" (quoting *Vincent by Staton v. Fairbanks Mem'l Hosp.*, 862 P.2d 847, 851 (Alaska 1993))).

required to find that Grubb's conduct was *both* the "but for" and the proximate cause of any losses before it could award restitution for those losses. The superior court's order awarding restitution demonstrated that the court understood this issue, with the court writing that "the parties agree that the issue is whether the defendant's conduct was the proximate cause of the restitution claim" — namely, T.R.'s claim of future lost income.[35]

Finally, Grubb's trial attorney himself understood the superior court to have made that finding. When the attorney filed a motion for reconsideration of the court's restitution order, he specifically described the court as having rejected his argument "that [Grubb's] conduct was not the proximate cause" for T.R.'s losses. Although the attorney raised various arguments in the motion for reconsideration, some of which could be construed as challenges to the court's proximate cause finding, the attorney never claimed that the court failed to make a proximate cause finding *at all*.

For these reasons, we reject Grubb's claim that the superior court failed to make a proximate cause finding when it awarded restitution for T.R.'s future lost wages and benefits. And because Grubb does not raise any additional challenges to the proximate cause finding, or argue that a reasonable factfinder could not find proximate cause under these circumstances, we uphold the court's finding.

*Grubb's argument that the superior court should have considered the mitigating effect of T.R.'s real estate work on the restitution award*

Next, Grubb argues, as he did in his original briefing, that the superior court did not consider the mitigating effect of T.R.'s real estate career on her future losses. In the civil context, the duty to mitigate refers to the "universal rule that a

---

[35] The court also noted that "[t]he defense primarily argues that the [S]tate has not demonstrated that the defendant's conduct was the proximate cause of the restitution claim."

wronged party must use reasonable efforts to avoid the consequences of injury done by another."[36]

As an initial matter, we note that T.R. did not request restitution for past wages lost between the end of the 2014-15 school year (when she resigned from her teaching position) and the restitution hearing in June 2017 (when she still had been unable to return to teaching, despite applying).[37] Thus, Grubb is not arguing that T.R. failed to mitigate *past* damages — that is, he is not requesting an offset of past damages by the higher real estate earnings T.R. may have earned during that time when she was clearly not teaching.[38]

Rather, Grubb's argument relates to mitigation of the *future* lost wages and benefits awarded to T.R. In particular, Grubb argues that the court failed to consider "whether the future lost wages and benefits award should have been reduced to offset the higher earnings she may have been able to earn in her real estate career once she was no longer teaching."

But even assuming that the duty to mitigate applies in the criminal restitution context, Grubb did not frame his arguments in the superior court in terms of T.R.'s failure to mitigate her damages by the allegedly higher earnings she may have

---

[36] *Univ. of Alaska v. Chauvin*, 521 P.2d 1234, 1239 (Alaska 1974).

[37] The Violent Crimes Compensation Board reimbursed T.R. in part for past wages lost *during* the 2014-15 school year when T.R. dropped her first period class to care for M.M., and the court ordered Grubb to pay restitution to the Board for this amount. The remaining portion of the past lost wages for this time period (the portion not compensated by the Board) was included in the restitution award to T.R.

[38] *See Central Bering Sea Fishermen's Ass'n v. Anderson*, 54 P.3d 271, 278-79 (Alaska 2002) (noting that contract damages for a wrongful termination should be the plaintiff's expected salary "less the amount she could expect to earn in alternative employment during that period"); *Spruce Equip. Co. v. Maloney*, 527 P.2d 1295, 1301 (Alaska 1974) (recognizing that a civil plaintiff is generally denied recovery for the portion of losses that results from the failure to use reasonable efforts to avoid or prevent harm).

been able to earn in her real estate career, nor did he ask the court to calculate such an offset (or suggest a figure for that offset).

In his initial opposition to the amended restitution judgment, filed prior to the evidentiary hearing, Grubb made a few claims that could be viewed as mitigation arguments: He argued that T.R. could have taken additional education courses to augment her position on the salary scale when she returned to teaching. He also argued that T.R. could teach past the twenty-year minimum period necessary to qualify her for early retirement, which would increase the percentage of her salary she would receive in retirement benefits. And he argued that T.R. could put some of her real estate earnings into a retirement account. But Grubb made these arguments as part of his broader claim that T.R.'s restitution claim for future damages was speculative; he did not mention the principle of mitigation.

As the State acknowledges, restitution is limited to losses that are "actual, provable, and reasonable,"[39] and this reasonableness requirement may already incorporate some level of mitigation. But Grubb concedes that the supreme court has already rejected his claim that T.R.'s projected losses were speculative or not firmly established.

The closest Grubb came to expressly invoking the doctrine of mitigation was in his motion for reconsideration of the superior court's restitution order, in which Grubb argued that "generally speaking a party harmed by another person has a duty to take reasonable efforts to limit the damage resulting from the harm." But Grubb did not tie this principle to the argument he now makes on appeal — *i.e.*, that T.R.'s future lost wages and benefits should be offset by the allegedly higher earnings she may have been able to earn in her real estate career. Rather, Grubb claimed that T.R. did not sufficiently

---

[39] *Grubb*, 546 P.3d at 603 ("Beyond the foreseeability of the harm, the damages themselves must be both reasonable and 'firmly established.'" (quoting *Lawrence v. State*, 764 P.2d 318, 322 (Alaska App. 1988))).

explain why she was required to quit her teaching job, and he suggested that she could have instead sought to take family medical leave, sick leave, or unpaid leave.

Perhaps because of these deficiencies in the record, Grubb's argument on appeal is fairly conclusory. He acknowledges that "[t]he [S]tate's evidence . . . established that T.R. likely complied with her obligation to 'use reasonable efforts' to avoid the consequences of any injury she suffered as a result of Grubb's actions."[40] But he faults the superior court for failing to determine whether these reasonable efforts required a reduction in the restitution amount.

Because Grubb did not claim in the superior court that T.R.'s future lost income should be offset by her potentially higher earnings as a real estate agent, there is little evidence in the record to support this theory.[41] Grubb presented no evidence that T.R. could, or in fact did, earn more in her real estate career because she was no longer teaching.[42] Grubb also presented no evidence as to how much more T.R. could earn — *i.e.*, how much T.R.'s damages should be reduced because of this alleged failure to

---

[40] *See Central Bering Sea Fishermen's Ass'n*, 54 P.3d at 278-79.

[41] T.R. testified about her income in 2015 and 2016 at the hearing, but she provided only "ballpark" guesses because she did not have her tax returns or other documents with precise numbers. She stated that her income in 2015, which included both a portion of her 2014-15 teaching salary and income from selling approximately thirteen houses, was "over $100,000," but the exact figure was not established and thus, it is not clear from the record what portion of this figure was attributable to real estate and also whether her sales were made during or after the school year. T.R. also testified, again providing only an estimate, that her income in 2016 was "probably $65,000." It is thus unclear from this record whether T.R.'s real estate business actually grew or by how much when she resigned from her teaching position, and Grubb did not further develop the evidence on this front.

[42] *See Fischer v. Kenai Peninsula Borough Sch. Dist.*, 548 P.3d 1086, 1092-93 (Alaska 2024) (concluding that the defendant failed to identify any genuine issue of material fact regarding whether the plaintiff mitigated its damages because he presented no evidence that the plaintiff's actions increased the amount of damages that the plaintiff suffered or that the defendant owed).

mitigate.[43] Based on this lack of evidence, we conclude that the superior court had no basis for reducing the restitution award, and did not err in failing to do so.

> *Grubb's argument that the restitution award for future lost income and retirement benefits violated the constitutional prohibition on excessive fines*

Grubb next argues that the restitution order for T.R.'s future lost wages and retirement benefits violates the constitutional prohibitions on excessive fines. Grubb concedes that because he did not raise this argument in the superior court, he must show plain error. "Plain error is an error that (1) was not the result of intelligent waiver or a tactical decision not to object; (2) was obvious; (3) affected substantial rights; and (4) was prejudicial."[44]

Both the Eighth Amendment to the United States Constitution and Article I, Section 12 of the Alaska Constitution prohibit the imposition of "excessive fines."[45] The Excessive Fines Clause "limits the government's power to extract payments . . . 'as *punishment* for some offense.'"[46] In order to be considered a "fine"

---

[43] In the civil context, the burden to prove that the plaintiff unreasonably failed to minimize their damages falls on the defendant — a burden that Grubb does not contest here. *West v. Whitney-Fidalgo Seafoods, Inc.*, 628 P.2d 10, 18 (Alaska 1981) ("The burden of proving that the plaintiff has unreasonably failed to minimize damages falls upon the defendant.").

[44] *Adams v. State*, 261 P.3d 758, 764 (Alaska 2011).

[45] U.S. Const. amend. VIII; Alaska Const. art. I, § 12. The Eighth Amendment's prohibition on excessive fines is incorporated against the states through the due process clause of the Fourteenth Amendment. *Timbs v. Indiana*, 586 U.S. 146, 151 (2019).

[46] *Austin v. United States*, 509 U.S. 602, 609-10 (1993) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)).

under the Eighth Amendment, the monetary sanction must therefore be punitive in nature.[47]

Neither the United States Supreme Court nor Alaska's appellate courts have decided whether the constitutional prohibition on excessive fines applies to restitution awards. In *Paroline v. United States*, however, the Supreme Court suggested that, while restitution is primarily intended to be remedial or compensatory, the "punitive purposes" of restitution "may be 'sufficient to bring [it] within the purview of the Excessive Fines Clause'" of the federal constitution.[48]

We have similarly recognized that restitution serves purposes that are punitive in addition to compensatory.[49] For example, we have applied both the *ex post facto* clause and the double jeopardy clause to restitution.[50] And as we noted in *Groom v. State*, a defendant may be incarcerated for failing to pay restitution, with each day of

---

[47]  *Jouppi v. State*, 566 P.3d 943, 951 (Alaska 2025).

[48]  *Paroline v. United States*, 572 U.S. 434, 456 (2014) (alteration in original) (quoting *United States v. Bajakajian*, 524 U.S. 321, 329 n.4 (1998)). The Court in *Paroline* recognized that "the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government." *Id.* (quoting *Browning-Ferris Indus.*, 492 U.S. at 268). But the Court also recognized that, while restitution is paid to a victim, it is imposed by the government at the end of a criminal proceeding and requires an underlying conviction. *Id.* Thus, the Court stated, "despite the differences between restitution and a traditional fine, restitution still implicates 'the prosecutorial powers of government.'" *Id.* (quoting *Browning-Ferris Indus.*, 492 U.S. at 275).

[49]  *See Groom v. State*, 551 P.3d 567, 572-73 (Alaska App. 2024).

[50]  *See Ortiz v. State*, 173 P.3d 430, 431-33 (Alaska App. 2007) (explaining that restitution is sufficiently punitive to implicate the *ex post facto* clause); *Reyes v. State*, 978 P.2d 635, 637-41 (Alaska App. 1999) (discussing how restitution is sufficiently punitive to implicate double jeopardy clause).

incarceration offsetting a portion of the restitution obligation (and thus, undermining the compensatory purpose of restitution).[51]

By authorizing the award of restitution in an amount that may be greater than a crime victim could seek in civil tort law, the supreme court's decision in *Grubb* reinforces the punitive aspect of restitution. In its original brief in this case, the State argued that so long as "restitution in a criminal case does not exceed the defendant's potential liability in a related civil case, there is little reason to ask whether restitution is unconstitutionally excessive." As the State acknowledges, however, the supreme court has now held that there is no bright-line rule limiting criminal restitution to the damages that would be available under civil tort law. This untethering of criminal restitution from civil tort damages suggests that criminal restitution is a punitive sanction to which the Excessive Fines Clause applies, consistent with the suggestion in *Paroline*.[52]

But even assuming that restitution awards are subject to the Excessive Fines Clause, a fine is excessive under the Eighth Amendment only if it is "grossly disproportional" to the gravity of the offense committed.[53] We conclude that the superior court did not plainly err by failing to find that the restitution award was grossly disproportionate.

---

[51] *Groom*, 551 P.3d at 572-73 (citing AS 12.55.051(a)).

[52] *See Paroline*, 572 U.S. at 456; *see also Austin v. United States*, 509 U.S. 602, 610 (1993) (recognizing, with respect to forfeitures, that "[w]e need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause"); *see also* Cortney E. Lollar, *Punishment Through Restitution*, 34 Fed. Sent. R. 98, 100 (2021) ("As its definitional parameters have expanded, criminal restitution has become less about disgorging unlawful gains and reimbursing out-of-pocket losses and more about punishment.").

[53] *Bajakajian*, 524 U.S. at 337.

In his original briefing, Grubb raised two main arguments as to why the restitution for future lost income meets this test.

One of these arguments is foreclosed by the supreme court's decision in this case. Grubb argued that T.R.'s losses were speculative and not tied to actual loss, and therefore not proportionate to the harm caused by Grubb's conduct. But as Grubb recognizes, the supreme court upheld the superior court's determination that T.R.'s losses were firmly established and thus essentially resolved this argument against him.[54]

In Grubb's other argument, he notes that T.R.'s future lost wages and benefits are nearly double the maximum fine ($100,000) available for Grubb's conviction,[55] and he contends that such a discrepancy disrupts the balance set by the legislature, suggesting gross disproportionality.[56]

As an initial matter, we note (as we discuss in the next section) that at least some portion of this award needs to be reduced to present value, which will necessarily decrease the present lump sum owed. But more importantly, as the supreme court recently made clear in *Jouppi v. State*, the standard of "gross disproportionality" does not require "strict proportionality," and significant deference is owed to legislative determinations regarding the appropriate punishment.[57]

---

[54] *State v. Grubb*, 546 P.3d 586, 603 (Alaska 2024).

[55] *See* AS 11.41.436(b); AS 12.55.035(b)(3).

[56] *See Bajakajian*, 524 U.S. at 339 n.14 (recognizing that the other penalties imposed by the legislature, including the maximum possible fine and term of imprisonment, are relevant to determining the gravity of the offense for purposes of assessing proportionality).

[57] *Jouppi v. State*, 566 P.3d 943, 954 (Alaska 2025). In *Jouppi*, the supreme court upheld the forfeiture of the defendant's $95,000 airplane, even though it was more than nine times the $10,000 maximum fine for the offense. *Id.* at 956-57 & n.87. We have also previously upheld against an excessive fines challenge the forfeiture of a $10,000 bond a defendant posted for his airplane, despite the fact that the maximum fine for the offense was $1,000. *Jordan v. State*, 681 P.2d 346, 350 (Alaska App. 1984).

Here, the Alaska legislature has mandated restitution unless the victim or other person entitled to restitution expressly declines it, and the Alaska Supreme Court has made clear that this includes "a direct claim for restitution for providing care to the child, unlike an adult caregiver seeking civil damages for providing services to a spouse."[58] Other courts have recognized that "[w]here the amount of restitution is geared directly to the amount of the victim's loss caused by the defendant's illegal activity, proportionality is already built into the order."[59]

In addition, courts have generally considered four primary (though nonexhaustive) factors in assessing gross disproportionality for purposes of the Excessive Fines Clause; these factors include "the nature and extent of the defendant's crime and its relation to other criminal activity" and "the nature and extent of the harm caused by the defendant's offense."[60] As part of his plea agreement in this case, Grubb admitted to the conduct charged in the original complaint, which included five acts of first-degree sexual abuse of a minor, each an unclassified felony carrying a fine of up

---

[58]    *Grubb*, 546 P.3d at 597.

[59]    *United States v. Dubose*, 146 F.3d 1141, 1145 (9th Cir. 1998) (quoting *United States v. Dean*, 949 F.Supp. 782, 786 (D. Or. 1996)); *see also United States v. Lessner*, 498 F.3d 185, 205-06 (3d Cir. 2007) (noting that restitution in the amount of the uncontested actual loss sustained by the victim weighed against gross disproportionality); *United States v. Newell*, 658 F.3d 1, 35 (1st Cir. 2011) (recognizing that "where the restitution order reflects the amount of the victim's loss[,] no constitutional violation has occurred"); *State v. Ramos*, 520 P.3d 65, 80 (Wash. App. 2022) (holding that "a restitution award based on a victim's actual losses is inherently proportional to the crime that caused the losses because the amount is linked to the culpability of the defendant and the extent of harm the defendant caused").

[60]    *See Jouppi*, 566 P.3d at 954 (setting out the four primary factors for evaluating whether a forfeiture is constitutionally excessive).

to $500,000.[61] In light of the nature of Grubb's conduct and the extent of the resulting harm, as found by the superior court, we conclude that — while the restitution award is high — it is not plainly and grossly disproportionate, especially given that the award must still be reduced to present value.[62]

Grubb makes one additional argument as part of his excessive fines claim: he contends that the Excessive Fines Clause requires consideration of his ability to pay. He also argues, relying on our decision in *Fletcher v. State*, that even if the Excessive Fines Clause does not require consideration of *every* defendant's ability to pay, it requires consideration of a defendant's ability to pay if the defendant was younger than eighteen years of age at the time they committed the offense.[63] (As we noted earlier, at

---

[61] AS 12.55.035(b)(1). Grubb was actually charged with five counts of *attempted* first-degree sexual abuse of a minor, but the facts in the complaint reflect five incidents of completed sexual penetration.

[62] In a single paragraph in his original briefing, Grubb asked us to independently evaluate whether the restitution order violated the Excessive Fines Clause of the Alaska Constitution, but maintained that we should still look to federal cases to supply the analytical framework for deciding whether a fine is excessive. We have done so and as we explain in this opinion, we find no plain error.

In his supplemental brief, Grubb advocates, for the first time, for a different analytical standard, arguing that the supreme court's decision expands the scope of available damages and therefore "warrants a more exacting approach to restitution under the Alaska Constitution's excessive fines clause." In particular, Grubb argues that, in light of the language of Article I, Section 12 and its inclusion of the goals of criminal administration, the prohibition on excessive fines in the Alaska Constitution should be read to prohibit an "unreasonable" fine, or one that "goes beyond [what is] reasonably necessary to further the purposes of criminal administration in a given case." Because this issue was raised for the first time in Grubb's supplemental briefing, we conclude that it is waived, and we do not address it further. *Cf. Reandeau v. State*, 265 P.3d 1045, 1055 (Alaska App. 2011) (noting that arguments raised for the first time in a reply brief are waived).

[63] *See Fletcher v. State*, 532 P.3d 286, 308 (Alaska App. 2023) (holding that, "before a sentencing court can impose a [functional] sentence of life without parole . . . on a juvenile offender tried as an adult, [the court must] affirmatively consider the juvenile offender's youth and its attendant characteristics and . . . provide an on-the-record sentencing explanation that explicitly or implicitly finds that the juvenile offender is one of the 'rare'

– 22 –                                                                 2817

the time of the offenses in this case, Grubb was sixteen years old. He was automatically charged as an adult under AS 47.12.030(a)(1).)

Again, Grubb did not present this argument to the superior court. Indeed, he did not contest the prosecutor's assertion that the superior court was precluded from considering his ability to pay, and in its order, the court stated that there was "no apparent dispute that [the restitution] statute does not permit the court to consider the defendant's ability to pay when determining and ordering restitution."

As the supreme court recently recognized in *Jouppi*, "As the proponent of a constitutional challenge, [the defendant] ha[s] the burden to develop both the factual and legal basis for his Eighth Amendment arguments in the trial court."[64]

Grubb has not met that burden. Grubb argues that the Excessive Fines Clause should be read as requiring a court to determine whether a restitution order would destroy a defendant's livelihood. But even assuming that is true,[65] our decision in *Hodges v. State* demonstrates why it is not obvious that the restitution award in this case, reduced to present value, would result in such a deprivation.[66]

Under AS 12.55.045(g), a court may not consider the defendant's ability to pay in setting the amount of restitution. In *Hodges*, the defendant argued that determining the *amount* of restitution without regard to a defendant's ability to pay

---

juvenile offenders 'whose crime reflects irreparable corruption'" (quoting *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012))).

[64]  *Jouppi*, 566 P.3d at 958.

[65]  *Id.* ("We assume, without deciding, that a forfeiture cannot constitutionally deprive Jouppi of his livelihood.").

[66]  *Hodges v. State*, 158 P.3d 864 (Alaska App. 2007).

violates the "principle of reformation" contained in Article I, Section 12 of the Alaska Constitution (the same provision that prohibits "excessive fines").[67]

We disagreed, explaining that concerns about reformation are adequately addressed by considering the defendant's ability to pay when setting the *method of payment* — *e.g.*, the "amount and frequency of the defendant's install payments" — and that Alaska's restitution statute requires courts to consider the defendant's ability to pay when setting the method of payment.[68]

We reach the same conclusion here: Grubb raises legitimate concerns about the ways in which a large restitution award could hinder a defendant's rehabilitation and undermine the goals of criminal administration. But particularly given Grubb's failure to object on this ground, there is nothing in the record to show that these concerns could not be adequately dealt with by considering his ability to pay when determining the method of payment.[69]

---

[67]  *Id.* at 867; Alaska Const. art. I, § 12.

[68]  Under AS 12.55.045(c), "[i]f a defendant is sentenced to pay restitution, the court may grant permission for the payment to be made within a specified period of time or in specified installments." In *Hodges*, we interpreted this statute to require a court to consider a defendant's ability to pay when setting the schedule and amount of the defendant's payments. *Hodges*, 158 P.3d at 866.

[69]  We also note that under AS 12.55.051, which governs the enforcement of restitution orders, it is an affirmative defense in contempt or probation revocation proceedings for failure to pay restitution that a defendant made good-faith efforts to do so. AS 12.55.051(a). The statute further prohibits a court from imprisoning a defendant solely because of the inability to pay, and it allows a defendant to request a hearing to modify the payment schedule of a restitution order if they are unable to pay through good-faith efforts. *Id.*; AS 12.55.051(c). We held in *Hodges* that requiring a court to consider the defendant's ability to pay when setting the method of payment was sufficient to protect a defendant's due process rights and the constitutional goal of reformation in sentencing, and this safeguard would also seemingly protect against the loss of livelihood. *Hodges*, 158 P.3d at 866-68.

Moreover, we note that the Eighth Amendment commandment to consider youth in sentencing applies to the most serious penalties — namely, lengthy terms of incarceration.[70] Grubb has not pointed to any case applying these principles to restitution.

For these reasons, we conclude that the superior court did not commit plain error by failing to consider whether the award for future lost income and retirement benefits violated the Excessive Fines Clause.

*Why we remand this case for the superior court to reduce T.R's future losses to present value*

Finally, Grubb argues that the superior court should have reduced the award for T.R.'s future lost wages and benefits to present value.[71] The State largely agrees with Grubb on this point, and the parties request that this Court remand Grubb's case to the superior court for this calculation.

---

[70] *See Miller v. Alabama*, 567 U.S. 460, 470 (2012) (holding that mandatory life imprisonment without the possibility of parole for juveniles violates the Eighth Amendment); *State v. Richardson*, 890 N.W.2d 609, 622-23 (Iowa 2017) (recognizing that "imprisonment is qualitatively different" from a restitution award "because [imprisonment] incapacitates the individual and foreswears rehabilitation during the period of incarceration," and thus, declining to apply the principles set out by the United States Supreme Court in *Miller* to a restitution award).

[71] *See* AS 09.17.040(b) (providing that "[i]n computing the portion of a lump-sum award that is attributable to future economic loss, the fact finder shall determine the present amount that, if invested at long-term future interest rates in the best and safest investments, will produce over the life expectancy of the injured party the amount necessary to compensate the injured party").

We agree that it is appropriate to reduce the award for future losses to present value.[72] As the parties recognize, this reduction would avoid the risk of overcompensating T.R. for her future losses.[73]

The parties appear to be in disagreement as to one point. Although the State agrees with Grubb that the superior court should reduce the award of $144,894 in future lost retirement income to its present value, the State argues that the salary adjustment of $52,144 should not be reduced to present value. The State notes that T.R. had already lost two full years of her teaching salary at the time of the restitution hearing, but instead of requesting restitution for these lost wages, the State instead requested the difference in her salary for four years going forward. The State maintains that a reduction to present value for the future wages is therefore inappropriate because "the danger of overcompensation is not present."[74] We think this question is best answered by the superior court on remand.[75]

We therefore remand this case to the superior court to reduce T.R.'s future losses to their present value.

---

[72] *See Marks v. State*, 496 P.2d 66, 67-68 (Alaska 1972) (requiring a court to independently assess the State's concession of error in a criminal case).

[73] *See Sherbahn v. Kerkove,* 987 P.2d 195, 201 (Alaska 1999).

[74] *Id.*

[75] The State argues that the restitution award should be reduced to its value at the time of the initial restitution hearing in 2017. We note that eight years have passed since that hearing, so the present value of the award may not be accurately reflected by reducing it to its 2017 value. We leave the determination of how to appropriately reduce the award to the superior court.

*A final comment about our understanding of the supreme court's decision in this case*

In addition to addressing the parties' arguments, we also find it necessary to briefly address the scope of the supreme court's decision in order to provide guidance to defendants, victims, criminal attorneys, and judges.

At first blush, the supreme court's decision in *Grubb* appears to reflect a significant shift in the law of criminal restitution. By stating that "damages in civil suits are . . . not directly equivalent to damages available for criminal restitution,"[76] the supreme court appears to overrule long-standing case law from this Court stating that restitution in criminal cases may not exceed the scope of damages that could be awarded in a related civil case.[77] The decision thus seems to untether criminal restitution from civil damages and set up two distinct tests of proximate causation. As we noted above, if civil law does not provide a reliable upper bound on the damages available in criminal restitution, other protections like the Eighth Amendment might.[78]

However, we read the supreme court's decision as more nuanced, creating a narrow exception to the general proposition that criminal restitution awards are guided by the civil law on damages.

The supreme court in *Grubb* was careful to explain that it did not think that civil law is irrelevant to determining criminal restitution awards. To the contrary, the supreme court in *Grubb* repeatedly expressed the view that civil law provides the starting point and, in many cases, the ending point for determining restitution.[79] The

---

[76] *State v. Grubb*, 546 P.3d 586, 597 (Alaska 2024).

[77] *See Ned v. State*, 119 P.3d 438, 446 (Alaska App. 2005).

[78] *See generally* Cortney E. Lollar, *Punishment Through Restitution*, 34 Fed. Sent. R. 98 (2021) (advocating for application of the Eighth Amendment as an upper bound on restitution awards).

[79] *Grubb*, 546 P.3d at 593, 599-600.

court noted that "civil damages concepts are often informative," and that, while the "logic of civil damages awards" is generally "similar" to the law of criminal restitution, it does not "map perfectly" onto that law.[80] Later in its decision, the supreme court explained that "[t]he amount recoverable in a civil case is often a reliable upper bound for the amount available in criminal restitution," and acknowledged that because restitution is limited to "actual loss or damages,"[81] "the amount recoverable as restitution will often be *lower* than that available in a civil suit in which punitive damages are available."[82]

Here, in determining that civil law did not strictly limit restitution in Grubb's case, the supreme court relied heavily on the fact that the legislature has defined parents of minor victims as statutory victims.[83] In other words, the court relied not just on the broad statement of legislative intent (*i.e.*, to make restitution available to "the greatest extent possible"[84]), but also on specific evidence that the legislature intended to provide broader recovery *in the context of this case* (*i.e.*, to parents of minor victims).

In particular, the supreme court concluded that "although T.R. might have no direct claim for civil damages in a tort suit, as the mother of a minor harmed by a crime, she is defined by statute as a victim entitled to direct restitution."[85] The supreme court therefore concluded that, by classifying parents as statutory victims, the

---

[80]  *Id.* at 593.

[81]  *Id.* at 600 (quoting *Grubb v. State*, 506 P.3d 791, 795 n.10 (Alaska App. 2022), *rev'd*, 546 P.3d 586 (Alaska 2024)).

[82]  *Id.* (emphasis added).

[83]  AS 12.55.185(19)(B)(ii).

[84]  SLA 1992, ch. 71, § 1.

[85]  *Grubb*, 546 P.3d at 593.

legislature intended to allow this discrete category of people to directly recover for injuries suffered as a result of a crime committed against their minor children, even if a parent would have no cognizable civil cause of action.[86] Because T.R. was a statutory victim, she was able to recover directly for any actual damages she incurred because of Grubb's criminal behavior instead of indirectly recovering the cost of care provided to her son.[87]

We therefore read the supreme court's decision in *Grubb* as reaffirming the general rule that courts should look to civil damages in awarding criminal restitution, absent specific evidence that the legislature intended to authorize criminal restitution that would not be available through a civil cause of action. That is, under *Grubb*, civil law still provides the basic governing principles for awards of restitution and will provide the upper bound in most cases. If litigants seek recovery in restitution that extends beyond what would be available at civil law, they should be able — as the supreme court did in *Grubb* — to point to specific evidence of legislative intent that would justify such an award.

---

[86]   *Id.* at 599.

[87]   *Id.* at 597 ("Statutory victims of crime, unlike familial caregivers in the civil context, have a direct claim for relief."); *see also Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1058 (Ill. 2020) ("When a child is injured by a tortfeasor's wrongful act, two causes of action arise — one in favor of the child's parents for the child's medical expenses (including any funeral expenses, if applicable) and another in favor of the child (or the child's estate) for all other categories of damages flowing from the injury."); *Norred v. Hartsfield*, 360 S.W.3d 583, 586 (Tex. App. 2011) ("While Texas law recognizes that a parent may recover damages for the care he or she provides to an injured child, any recovery is measured by the value of the services provided, not by the amount of income lost while providing the care."); *Mancino v. Webb*, 274 A.2d 711, 713 (Del. Super. 1971) (explaining that "the measure of recovery for care furnished an injured child by the parent after the child departs the hospital is not the wages lost by the parent, but rather the reasonable value of the care or attendance rendered").

*Conclusion*

We REMAND this case to the superior court for a reduction of the court's restitution award to its present value. In all other respects, we AFFIRM the judgment of the superior court.

Judge ALLARD, concurring.

I have significant concerns about the speculative nature of the restitution order in this case but I nevertheless join the majority because I think this outcome is dictated by the way that the case was litigated in the superior court and by the Alaska Supreme Court's recent decision in *State v. Grubb*.[1] I remind trial courts, however, that restitution awards should be "firmly established" and not speculative.[2]

I also remind trial courts that both the state and federal constitutions require that there be some checks and parameters placed on restitution. Courts should therefore be sensitive to the potential constitutional limits imposed by the Fifth Amendment (due process), the Sixth Amendment (right to a criminal trial), the Seventh Amendment (right to a civil trial), the Eighth Amendment (cruel and unusual punishment and excessive fines) and the Alaska state constitutional counterparts.[3]

Lastly, I note that while there is a natural desire to want to see every crime victim compensated fully for their losses, the reality is that the vast majority of restitution remains unpaid because of criminal defendants' indigency and inability to

---

[1]    *State v. Grubb*, 546 P.3d 586 (Alaska 2024). *But see United States v. Fountain*, 768 F.2d 790, 801-02 (7th Cir. 1985) ("The reason for treating past and future earnings differently is practical: the calculation of lost future earnings involves the difficult problem of translating an uncertain future stream of earnings into a present value. . . . It is not a problem me[ant] for solution in a summary proceeding ancillary to sentencing for a criminal offense.").

[2]    *Grubb*, 546 P.3d at 603 (quoting *Lawrence v. State*, 764 P.2d 318, 322 (Alaska App. 1988)).

[3]    U.S. Const. amends. V-VIII; Alaska Const. art. I, §§ 7, 11, 12, 16. I note that the Seventh Amendment does not directly apply to the States but that the Alaska Constitution entitles a person to a jury trial "in civil cases where the amount in controversy exceeds two hundred fifty dollars." Alaska Const. art. I, § 16; *see also State v. Arnett*, 496 P.3d 928, 937-38 (Kan. 2021) (declaring statutory law converting restitution order into civil judgment unconstitutional under Kansas constitutional provision guaranteeing the right to a jury, because restitution could be ordered by a judge alone, not a jury).

pay.[4] In my view, victims are not necessarily well served by false hopes of compensation that unrealistic restitution orders can create.

---

[4] *See* Cortney E. Lollar, *Punishment Through Restitution*, 34 Fed. Sent. R. 98, 98 (2021) (noting that most restitution judgments are never paid but the awards have the effect of keeping defendants "enmeshed in the criminal legal system long after they have served the requisite period of incarceration or supervised release"); *see also* U.S. Gov't Accountability Off., *Federal Criminal Restitution: Most Debt Is Outstanding and Oversight of Collections Could Be Improved* 25 (2018) (noting that ninety-one percent of unpaid federal restitution judgments remain unpaid because of defendants' inability to pay).

Judge WOLLENBERG, concurring.

In *Groom v. State*, this Court held that, although criminal restitution is considered punishment for purposes of the Sixth Amendment, neither the federal constitution nor the state constitution preclude a court from relying on facts not proven to a jury in setting the amount of a restitution award.[1] I dissented from this Court's decision, concluding that the right to a jury trial in both the Sixth Amendment to the United States Constitution and Article I, Section 11 of the Alaska Constitution applies to criminal restitution because any fact that increases the penalty otherwise authorized by the jury's verdict must be presented to a jury and proved beyond a reasonable doubt.[2]

In *State v. Grubb*, the Alaska Supreme Court authorized a type of criminal restitution award for future lost wages and benefits that it implicitly recognized would not be recoverable under civil law.[3] By untethering criminal restitution from civil damages, the Alaska Supreme Court's decision in *Grubb* only reinforces the punitive nature of criminal restitution in Alaska — further supporting my conclusion that the constitutional right to a jury trial in criminal cases applies to the amount of criminal restitution beyond that otherwise authorized by the underlying verdict.[4]

---

[1] *Groom v. State*, 551 P.3d 567, 573-75 (Alaska App. 2024).

[2] *Id.* at 576-82 (Wollenberg, J., dissenting).

[3] *State v. Grubb*, 546 P.3d 586, 593, 599 (Alaska 2024).

[4] *See Groom*, 551 P.3d at 582 (Wollenberg, J., dissenting) ("Restitution is part of the 'criminal prosecution' to which [the] Sixth Amendment jury trial right attaches. . . . Imposing it serves punitive aims and not paying it has punitive consequences." (quoting *State v. Arnett*, 496 P.3d 928, 943 (Kan. 2021) (Standridge, J., dissenting))).

I note that requiring that restitution be proved to a jury would have the benefit of helping to ensure the kind of full consideration and orderly presentation of evidence (including, if necessary, expert testimony) that should serve as a prerequisite to the imposition of substantial damages, and which is often lacking in restitution proceedings that occur well after sentencing at the conclusion of a criminal case. *See* Alaska R. Crim. P. 32.6(c)(2) (providing that "[i]f the amount of restitution and the names of the victims or

other persons seeking restitution are not known at the time of sentencing," the State must file a proposed restitution judgment within ninety days after sentencing).